# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

KATHLEEN Y., O.B.O. IAN C.,[1]

                         Plaintiff,

    v.

ANDREW SAUL,
Commissioner of Social Security,

                       Defendant.        Case No. 5:19-CV-00003-SLG

## DECISION AND ORDER

On or about February 13, 2014, Ian C. protectively filed applications for disability insurance benefits ("DIB") under Title II and for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"),[2] alleging disability beginning May 4, 2012.[3]  Plaintiff has exhausted his administrative remedies and filed a Complaint seeking

---

[1] Kathleen Y. filed a Social Security Complaint with this Court on behalf of her deceased son, Ian C.  For consistency, the Court will refer to Ian C. as Plaintiff.  Plaintiff's name is partially redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time.  Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Plaintiff brought claims under Title II and Title XVI.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs.  *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 53.  The applications list April 4, 2014 as the application date. A.R. 553, 555.

relief from this Court.[4]  Plaintiff's opening brief asks the Court to reverse and remand the agency's decision for the immediate payment of benefits.[5]  The Commissioner filed an Answer and a brief in opposition to Plaintiff's opening brief.[6]  Plaintiff filed a reply brief on August 3, 2020.[7]  Oral argument was not requested and was not necessary to the Court's decision.  This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8]  For the reasons set forth below, Plaintiff's request for relief will be granted.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9]  "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than

---

[4] Docket 1 (Plaintiff's Compl.).

[5] Docket 26 (Plaintiff's Br.).

[6] Docket 22 (Answer); Docket 31 (Defendant's Br.).

[7] Docket 32 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 2 of 64

a preponderance."[11]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which he did not rely."[14]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[17]

---

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 3 of 64

## II.    DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[18]  In addition, Supplemental Security Income (SSI) may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[19]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[22] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[23] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[24] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[25] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[26] *The ALJ determined that Plaintiff had not engaged in substantial activity since May 4, 2012, the alleged onset date.*[27]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the

---

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[27] A.R. 57.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 5 of 64

twelve-month duration requirement.[28]  *The ALJ determined that Plaintiff had the following severe impairments: substance abuse; schizoaffective disorder, bipolar type; insomnia; and uncomplicated diabetes mellitus, type II.  The ALJ determined that Plaintiff's traumatic brain injury was not a medically determinable impairment.  The ALJ also determined that Plaintiff's right knee impairment, cancer, back pain, seizure disorder, status post left radical nephrectomy, onychomycosis, anemia, cervical strain, right sided spasmodic torticollis, right shoulder impairment, alcoholic hepatitis, and pancreatitis were non-severe.[29]  Further, the ALJ determined that if Plaintiff had "stopped the substance use, the remaining limitations would cause more than a minimal impact on the [Plaintiff]'s ability to perform basic work activities; therefore, the [Plaintiff] would continue to have a severe impairment or combination of impairments."[30]*

**Step 3.**  Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.[31]  If not, the evaluation goes on to the fourth step.  *The ALJ determined that Plaintiff's impairments, including the substance use disorder, met sections 12.03 and 12.15 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20*

---

[28] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[29] A.R. 57–61.

[30] A.R. 62–63.

[31] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

*C.F.R. §§ 404.1520(d), 416.920(d)).[32]  The ALJ then determined that if Plaintiff had "stopped the substance use," the Plaintiff would not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.920(d))."[33]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[34] *The ALJ determined that if the Plaintiff had "stopped the substance use," the Plaintiff would have had the residual functional capacity to perform medium work except the Plaintiff was limited to occasional climbing of ramps or stairs, ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching, and crawling; occasional exposure to unprotected heights; and frequent exposure to hazardous and moving machinery.[35]*

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do his past relevant work, the claimant is deemed not to be disabled.[36]

---

[32] A.R. 61–62.

[33] A.R. 63–64.

[34] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[35] A.R. 64.

[36] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 7 of 64

Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that if the Plaintiff had stopped the substance use, he would be unable to perform past relevant work.*[37]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[38] *The ALJ determined that if Plaintiff had "stopped the substance use, considering the [Plaintiff]'s age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the [Plaintiff] could perform."*[39]

The ALJ concluded that the substance use disorder was a contributing factor material to the determination of disability because the [Plaintiff] would not be disabled if he stopped the substance use. Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the decision.[40]

---

[37] A.R. 72.

[38] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[39] A.R. 72.

[40] A.R. 73.

Case 5:19-cv-00003-SLG   Document 33   Filed 10/09/20   Page 8 of 64

### III. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1978.[41]  Plaintiff reported working until 2008 in construction and commercial fishing.[42]  On or about July 31, 2014, the Social Security Administration ("SSA") determined that Plaintiff was not disabled under the applicable rules.[43]  After two continued hearings, Plaintiff appeared and testified with representation by his mother, Kathleen Y., at hearings held on September 8, 2016, May 1, 2017, and August 24, 2017 before ALJ Paul Hebda.[44]  On November 16, 2017, the ALJ issued an unfavorable ruling.[45]

On January 11, 2018, Plaintiff filed a request for review before the Appeals Council.[46]  While the request for review was pending, Plaintiff died on July 4, 2018.[47]  His mother, Kathleen Y., filed a request to be designated as a substitute party for the pending Appeals Council actions in both the Title II and Title XVI claims.[48]  On March 7, 2019, the Appeals Council dismissed Plaintiff's request for review under Title XVI for supplemental security income.  The Appeals Council determined that no survivor or other qualified

---

[41] A.R. 553.

[42] A.R. 633, 646.

[43] A.R. 291–92.

[44] A.R. 117–19, 132–38, 161–81.

[45] A.R. 50–74.

[46] A.R. 551.

[47] A.R. 31, 44.

[48] A.R. 14–15.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 9 of 64

person adversely affected sought to proceed with the request for review and no evidence indicated that Plaintiff authorized interim assistance reimbursement to a State under section 1631(g) of the Act.[49] There is no evidence in the Court's record that Kathleen Y. specifically appealed the Appeals Council's dismissal of Plaintiff's Title XVI claim.[50] On March 7, 2019, the Appeals Council denied Plaintiff's request for review under Title II for disability insurance benefits.[51] On May 6, 2019, Kathleen Y. appealed the Commissioner's final decision for the Title II claim to this Court on behalf of the Plaintiff; she is represented by counsel in this appeal.[52]

*Medical Records and Medical Opinion Evidence*

The medical evidence spans from July 3, 2007 to March 2019. However, the relevant time period for this litigation is limited to the alleged onset date of May 4, 2012 through the date last insured of June 30, 2012.[53] Although the Court will focus on the

---

[49] The Appeals Council dismissed Plaintiff's SSI claim pursuant to 20 C.F.R. § 416.1471(b) and provided "that the Appeals Council may dismiss a request for review where the claimant dies and the dismissal will not adversely affect a survivor or other qualified person, as those terms are defined in 20 C.F.R. § 416.542(b), who wishes to continue the action. However, with respect to claims for supplemental security income, the Appeals Council will not dismiss a request for review if the claimant had authorized interim assistance reimbursement to a State pursuant to section 1631(g) of the Social Security Act (20 C.F.R. § 416.1471(b))." A.R. 11; *see also* 20 C.F.R. §416.1471(b).

[50] A.R. 11. *See also* 20 C.F.R. § 416.542(b).

[51] A.R. 1–12.

[52] Docket 1. Plaintiff states in his opening brief that "[i]n approaching this litigation that is now framed by the May 2012 alleged onset date and the June 30, 2012 date last insured for Title II, the changed nature of the claim is reflected here." Docket 26 at 1. *See also* A.R. 143.

[53] Because Plaintiff was only insured for disability benefits through June 30, 2012, he must establish a disability on or prior to that date. Docket 26 at 1; A.R. 11. *See also* 42 U.S.C. § 423(d)(1)(A). In his application, Plaintiff alleged disability beginning May 4, 2012. A.R. 53, 553. Plaintiff also filed a previous application on November 5, 2007. The claim was denied by the ALJ

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 10 of 64

time period between May 2012 and June 30, 2012, the following are the relevant medical records[54] before the May to June 2012 time period:

On July 3, 2007, Debra Friedman, M.D., of the Fred Hutchinson Cancer Research Center in Seattle, Washington, wrote a letter on Plaintiff's behalf. Dr. Friedman reported that Plaintiff had been treated in 1982 for a Wilms' Tumor at age four. She noted that "[a]lthough cured long-term from his cancer, [Plaintiff] has and is at risk for adverse late physiologic and psychosocial effects of this cancer and its therapy." Dr. Friedman also noted that "[i]t is well documented in the medical literature that adult survivors of childhood cancer can experience adverse health decades after their childhood cancer therapy." She requested that Plaintiff receive ongoing surveillance and treatment for his psychiatric and physiologic conditions.[55]

On March 15, 2010, Plaintiff saw Ronald Weisner, M.D., for a follow up visit. Plaintiff reported that he had a court hearing the same day and requested reinstatement of Seroquel.[56] Plaintiff reported that Seroquel helped with sleep and auditory hallucinations. Dr. Weisner observed that Plaintiff did "not really have too much insight

---

on April 26, 2010 and the Appeals Council denied Plaintiff's request for review on May 4, 2012. A.R. 54, 239–54, 261–65.

[54] There are multiple duplicate treatment notes in the Court's record. To the extent possible, the Court cites the first treatment note to appear in the medical record.

[55] A.R. 928.

[56] Seroquel is used to treat mental/mood conditions such as schizophrenia, bipolar disorder, and sudden episodes of mania or depression associated with bipolar disorder. *See* https://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details.

into his alcohol problem, but his speech [was] focused and goal-directed."  Dr. Weisner noted that "[a]uditory hallucinations come and go with him, very dependent on whether he takes his medication, and certainly, it flares up when he drinks."[57]

On May 3, 2010, Plaintiff followed up with Dr. Weisner.  He reported binge drinking for three days before spending three days in jail for violation of his probation.  Dr. Weisner observed that Plaintiff remained focused in the interview and did not go on tangents.  Dr. Weisner noted that Plaintiff did not complain of auditory hallucinations and that Plaintiff reported his hallucinations "only flare[ ] up when he drinks."  He diagnosed Plaintiff with schizoaffective schizophrenia, presently in remission and episodic binge drinking.  Dr. Weisner reinstated Plaintiff's prescription of Seroquel.[58]

On May 20, 2011, Plaintiff went to the emergency department at Ketchikan General Hospital for hallucinations.  The attending physician noted that Plaintiff had not been taking his psychiatric medications for about 10 days.  Plaintiff was intoxicated upon arrival. He received Seroquel and Haldol medications at the hospital and his condition improved. The attending physician recommended that Plaintiff follow up with an appointment to discuss alcohol treatment.[59]

On June 4, 2011, Plaintiff was brought to the emergency department for behavior changes and manic behavior as observed by his family.  Plaintiff reported no alcohol use.

---

[57] A.R. 860.

[58] A.R. 861–62.

[59] A.R. 2524–27.

The attending physician observed that Plaintiff had "altered though processes, verbalized as racing thoughts and non-sensical thoughts. The patient does not feel treatment is necessary. He seems unconcerned about his current condition."[60]

On July 11, 2011, Plaintiff arrived at the emergency department of Ketchikan General Hospital in a private vehicle for an injury to the right foot. On physical examination, the attending physician observed odd, pressured, tangential speech, but that Plaintiff was able to converse and communicate.[61]

On August 16, 2011, Plaintiff initiated care with Stephen Brogdon, M.D., for follow up of schizoaffective disorder, alcohol dependence, and anxiety, not otherwise specified. On mental status examination, Dr. Brogdon observed that Plaintiff was casually groomed and in no acute distress. He also observed that Plaintiff's speech had a normal rate, tone, and volume and was not pressured. He noted that Plaintiff's thought process was "roughly linear and goal directed." He observed no tangential thoughts, racing thoughts, flight of ideas, no suicidal or homicidal ideation, no perceptual disturbances, a good mood, a somewhat guarded and flat affect, fair insight, and unimpaired judgment. Plaintiff reported hallucinating frequently, but that he had not hallucinated "in a few days." Plaintiff reported that he took Seroquel "depending on how he [felt] and that he had a difficult time sleeping even when he [took] it."[62] Dr. Brogdon discussed adjusting Plaintiff's

---

[60] A.R. 2518–20.

[61] A.R. 2512–13.

[62] A.R. 864.

medications, but Plaintiff felt he was "doing well on them." He assessed Plaintiff with poor coping skills; low social functioning; and economic concerns. Dr. Brogdon assigned a global assessment of functioning score of 50–60.[63]

On September 7, 2011, Plaintiff followed up with Dr. Brogdon. He reported traveling "south" to live and work with his father. Plaintiff reported that he did not want his medications changed and that his alcohol consumption had "gone down considerably." Dr. Brogdon observed that Plaintiff was casually groomed; in no acute distress; with a "somewhat ruddy complexion"; linear and goal-directed thoughts; no perceptual disturbances; a grossly intact cognition; fair insight; and currently unimpaired judgment.[64]

On December 13, 2011, Plaintiff saw Dr. Brogdon. Plaintiff reported that he had been "drinking excessive amounts of alcohol since returning from a trip down south." Dr. Brogdon observed that Plaintiff was intoxicated at the appointment. He sent Plaintiff to the emergency room to initiate a detoxification protocol while awaiting residential rehabilitation for alcohol dependence.[65] Plaintiff left the emergency department before treatment for detoxification was completed.[66]

On December 18, 2011, Plaintiff presented to the emergency department at Ketchikan General Hospital for acute alcohol intoxication. The attending physician

---

[63] A.R. 864–65.

[64] A.R. 866.

[65] A.R. 867–68.

[66] A.R. 2505–10.

determined that Plaintiff's other medical problems were stable and his mood and affect were appropriate.[67]

On January 16, 2012, Plaintiff saw Dr. Brogdon for follow up. Dr. Brogdon observed that Plaintiff was "in a manic state" with "considerable grandiosity," talking about "a lot of historical figures such as Genghis Khan." Plaintiff reported that he had not taken his medications for several weeks. Dr. Brogdon noted that it was "unclear whether the patient's psychotic behavior [was] due to alcohol ingestion" or if it "really represent[ed] a true manic episode." He noted that Plaintiff appeared "to be acutely intoxicated."[68]

On February 8, 2012, Plaintiff followed up with Dr. Brogdon for schizoaffective-type schizophrenia; alcohol dependence; mood disorder, not otherwise specified; anxiety disorder, not otherwise specified; and insomnia. Plaintiff reported that he had been sober for the past month and was doing well. He reported that he thought that his medications helped him avoid alcohol. Dr. Brogdon observed that Plaintiff was well-groomed and in no acute distress. He observed no pressured speech; linear and goal-directed thought processes; no racing thoughts, tangential thoughts, or flight of ideas; no perceptual disturbances; grossly intact cognition; and unimpaired judgment. Dr. Brogdon renewed Plaintiff's prescriptions. Dr. Brogdon's assessment of Plaintiff included problems with coping skills, social support, social function, excessive drinking, and employment.[69]

---

[67] A.R. 2492–2502.

[68] A.R. 869–70.

[69] A.R. 871–72.

On March 7, 2012, Plaintiff followed up with Dr. Brogdon. His mother attended the appointment and reported that Plaintiff would overtake his Ativan, run out of it toward the end of the month, then self-medicate with alcohol, but that his alcohol consumption was considerably reduced. Dr. Brogdon opined that "harm reduction would clearly justif[y] trying to help the patient cut down on his drinking by controlling the symptoms that he is self-medicating for, even if there is a potential increased risk for a drug-drug interaction or problems with liver metabolism." Dr. Brogdon observed that Plaintiff was appropriately groomed and in no acute distress with linear and goal-directed thought processes and grossly intact cognition; no pressured speech; no racing thoughts; no tangential thoughts; no flight of ideas; no perceptual disturbances; fair insight; and unimpaired judgment.[70]

On March 22, 2012, Plaintiff followed up with Dr. Brogdon, but did not have an appointment. Dr. Brogdon noted that it was "actually somewhat of a mystery as to why the patient showed up today," but Plaintiff reported that he had run out of his clonazepam medication early and had used alcohol "the last day or two to self-medicate." Dr. Brogdon noted "[i]t is unclear at this point if the patient is intoxicated or not." Plaintiff also reported that Seroquel provided some added mood stability and that he had had some breakthrough psychotic symptoms on stopping haloperidol. Dr. Brogdon observed that Plaintiff's judgment was "currently unimpaired," but also noted that Plaintiff "again seem[ed] somewhat delusional" and that he "ramble[d] fairly incoherently . . . before agreeing to follow up again in another 2 weeks." Dr. Brogdon assessed Plaintiff with

---

[70] A.R. 873–74.

problems with coping skills and low functioning. He notified Plaintiff that future medication noncompliance and future alcohol use would be grounds for termination from the clinic.[71]

On April 9, 2012, Plaintiff followed up with Dr. Brogdon. He reported trying to get into residential rehabilitation for the past two months. He also reported that clonazepam had been very effective in preventing withdrawal symptoms and helping the patient moderate his alcohol consumption. Dr. Brogdon observed that Plaintiff's appearance was disheveled with roughly linear and goal-directed thoughts; grossly intact cognition; no perceptual disturbances, racing thoughts, tangential thoughts, or flight of ideas; fair insight; and currently unimpaired judgment.[72]

On April 11, 2012, Plaintiff presented at the emergency department at Ketchikan General Hospital for medication overdose. The attending physician noted that although Plaintiff reported overdosing on clonazepam, his urine screen was positive for opiates and negative for benzodiazepines. Plaintiff denied suicidal intention. He was discharged on April 12, 2012.[73]

On April 12, 2012, Plaintiff saw Leah Canfield, BA, for a behavioral health assessment. Plaintiff reported that he had been sober for four days and was going through withdrawals. BA Canfield observed a normal memory; normal speech; logical and coherent thought processes; appropriate thought content; a normal mood; and

---

[71] A.R. 875–76.

[72] A.R. 877–78.

[73] A.R. 2417–2429.

mature judgment. BA Canfield recommended inpatient treatment based on diagnoses of alcohol dependence, schizoaffective disorder, and narcissistic personality and problems with primary support, some economic problems, and economic problems.[74]

On April 23, 2012, Plaintiff followed up with Dr. Brogdon. He reported being sober for 17 days. He also reported that "with his sobriety he [had] been experiencing less positive symptoms of his schizophrenia" and that he was "no longer hallucinating as often." Plaintiff also reported that he was trying to get into residential rehabilitation, but the earliest he could get in was October. Upon mental status examination, Dr. Brogdon observed that Plaintiff was appropriately groomed and in no acute distress. He also observed that Plaintiff had linear and goal-directed thought processes; grossly intact cognition; fair insight; currently unimpaired judgment; no pressured speech; no racing thoughts, tangential thoughts, or flight of ideas; no perceptual disturbances; a good mood; and a flat affect, "but somewhat more composed than when the patient has previously been seen." Dr. Brogdon endorsed Plaintiff's attempts to seek inpatient rehabilitation and continued Plaintiff's medications.[75]

On May 2, 2012, Plaintiff followed up with Dr. Brogdon. He reported that he had been sober for three and one-half weeks and that he had "not had any psychotic symptoms since that time despite going off his neuroleptics for a period of about a week." Dr. Brogdon observed that Plaintiff looked "much better in appearance, taking good care

---

[74] A.R. 703–08.

[75] A.R. 879.

of personal hygiene, and [was] appearing much more fit." He also observed that Plaintiff had linear and goal-directed thought processes; grossly intact cognition; good insight; unimpaired judgment; no pressured speech; no racing thoughts, tangential thoughts, or flight of ideas; no perceptual disturbances; a good mood; and a full range and euthymic affect.[76]

The following is the relevant record during the period from May 4, 2012 through June 30, 2012:

On June 1, 2012, Plaintiff saw Dr. Brogdon. He reported that he had been "mostly compliant with his medications," but would still run out of the medications two days before the end of the month." He reported remaining abstinent from drinking. Dr. Brogdon noted that Plaintiff appeared "to be improving quite a bit in general."[77]

The following are the relevant records after June 30, 2012:

On July 3, 2012, Plaintiff followed up with Dr. Brogdon. Dr. Brogdon noted that Plaintiff was accompanied by his mother and that she reported Plaintiff had relapsed with his alcoholism. She also reported that Plaintiff "managed to lose [a] large amount of his clonazepam and ran out fairly early in the month, the end of the result of which was that he started drinking again." Dr. Brogdon required Plaintiff to have a third party dispense his medications due to non-compliance. At the appointment, Dr. Brogdon noted that Plaintiff's mother agreed to dispense Plaintiff's medications. Dr. Brogdon observed that

---

[76] A.R. 880.

[77] A.R. 881.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 19 of 64

Plaintiff "look[ed] to be somewhat intoxicated at present, smelling somewhat of alcohol." He assessed Plaintiff with problems with coping skills, problems related to the social environment, and parent-child relational problems.[78]

On August 8, 2012, Plaintiff followed up with Dr. Brogdon. Dr. Brogdon noted that Plaintiff's mother accompanied Plaintiff and reported that Plaintiff "abused his medications over the last month." Dr. Brogdon also noted that Plaintiff "has shown time and again that he is not capable of managing his own medications" and again required that Plaintiff's mother dispense the medications. Dr. Brogdon opined that Plaintiff did "benefit a great deal from being on an antipsychotic." He observed that Plaintiff was appropriately groomed and in no acute distress with roughly linear and goal-directed thought processes and no racing thoughts, tangential thoughts, or flight of ideas, "although there [was] some thought blocking present." He observed that Plaintiff's insight was fair to low and his judgment was unimpaired. Dr. Brogdon also noted that Plaintiff had complained of visual hallucinations "over the last month." He opined that the hallucinations seemed to have "occurred in the context of withdrawal from his benzodiazepine as well as his antipsychotic." He noted problems with coping skills, problems with social support, problems with social functioning, and low functioning.[79]

On August 13, 2012, Plaintiff saw Michael Dosik, M.D., at Alaska Native Medical Center in Anchorage, Alaska, for a consultation and follow up of his childhood Wilms'

---

[78] A.R. 882–83.

[79] A.R. 884–85.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 20 of 64

tumor.  Plaintiff reported being concerned about his "excessive drinking."  He also reported that he took Seroquel and Klonopin "for sleep, as far as he is concerned" and that he had had hallucinations four years prior "as a single episode."[80]

On October 16, 2012, Plaintiff followed up with Dr. Brogdon.  His mother again reported that Plaintiff had not been taking his medications as prescribed.  Plaintiff reported that he was "a little more psychotic than usual" and that he had been "hearing voices and sometimes [was] hearing other types of perceptual disturbances such as knocking on his door, and also the sensation that tinfoil [was] being crushed."  Dr. Brogdon noted that Plaintiff was "perpetually going through withdrawal from early use of the clonazepam," but that despite Plaintiff's continued noncompliance he was "continuing to treat this patient because I believe that to refer this patient to another provider at this point would be to further marginalize the patient, and eventually lead to an even worse outcome."  Dr. Brogdon observed that Plaintiff was "somewhat disheveled" with a dysphoric and flat affect; "fairly poor" insight; unimpaired judgment; and linear and goal-directed thought processes.  He noted that he would seek inpatient hospitalization for stabilization if Plaintiff was not compliant or symptoms worsened in the next week.[81]

On October 23, 2012, Plaintiff followed up with Dr. Brogdon.  He reported taking his medications as prescribed when his mother was dispensing them to him each day.  Dr. Brogdon noted Plaintiff was "doing much better than when I saw him a week ago."

---

[80] A.R. 783–85.

[81] A.R. 886–87.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 21 of 64

Plaintiff stated he had not had any alcohol for several days. Dr. Brogdon noted that Plaintiff had "struggled with alcohol abuse in the past, but has maintained relatively long periods of sobriety, in which he has been relatively productive." He noted that Plaintiff seemed stabilized on his current medications. Dr. Brogdon noted that Plaintiff was appropriately groomed. He also noted that Plaintiff's cognition was intact and mood was better, but that Plaintiff's affect was "still somewhat flat and unreactive." Dr. Brogdon observed that Plaintiff's insight was "fair" and his judgment was "learning impaired." He continued to assess Plaintiff with problems with coping skills, low functioning, and medicine nonadherence.[82]

On November 26, 2012, Plaintiff followed up with Dr. Brogdon. Plaintiff reported that he had been "fairly compliant with his medications; a fact that [was] attested to by his mother." However, Plaintiff's mother reported that Plaintiff had been "acting a little off and that perhaps the medications were not doing the full job that they used to do covering him for his psychosis." Dr. Brogdon observed that Plaintiff was "somewhat disheveled, smelling a little of alcohol." He also observed that Plaintiff's judgment was "currently unimpaired" with fair insight and Plaintiff exhibited no pressured speech; no racing thoughts, tangential thoughts, or flight of ideas; and a linear and goal directed thought processes. Dr. Brogdon continued to assess Plaintiff with problems with coping skills,

---

[82] A.R. 888–89.

problems related to continued alcohol use, low functioning, and problems related to social environment.[83]

On December 3, 2012, Plaintiff saw Dr. Brogdon. He reported that he did not believe that his medication was "working anymore." On examination, Dr. Brogdon noted that Plaintiff experienced "perceptual disturbances of both paranoid thoughts and auditory and visual hallucinations." Dr. Brogdon adjusted Plaintiff's medications by discontinuing Seroquel and initiating a trial of Zyprexa.[84]

On January 31, 2013, Plaintiff saw Dr. Brogdon. He reported recent knee surgery. He reported that he had "been doing well for the last 3 days and has not had any additional psychotic episodes," but Dr. Brogdon noted that Plaintiff also reported some "breakthough psychotic episodes, mainly with auditory and visual hallucinations that lasted usually until he took his Seroquel for sleep." Plaintiff also reported that he had maintained sobriety off alcohol. Dr. Brogdon observed that Plaintiff's judgment was "currently unimpaired" with fair insight and that Plaintiff exhibited no pressured speech; no racing thoughts, tangential thoughts, or flight of ideas; and had linear and goal directed thought processes.[85]

On February 4, 2013, Plaintiff saw Patti Green, BWS, at Ketchikan Indian Community Social Services Department for a substance abuse assessment. Ms. Green noted that Plaintiff was appropriate in appearance and behavior; was oriented x3; and

---

[83] A.R. 890–91.

[84] A.R. 892–93.

[85] A.R. 894–95.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 23 of 64

had a normal memory, appropriate thought content, congruent affect, and normal/calm mood. Ms. Green noted that Plaintiff "had a slight smell of alcohol" and had reported drinking "a couple of beers" before the appointment. He also reported that he was not taking psychiatric medications.[86]

On February 6, 2013, Plaintiff followed up at Ketchikan Indian Community Tribal Health Clinic after an emergency room visit. He had been treated nightly for three nights in a row for acute intoxication, tremors, and muscle spasm.[87]

On February 25, 2013, Plaintiff's mother met with Dr. Brogdon. She reported that Plaintiff had "been to the emergency department 3 times over the last month with alcohol induced psychosis" and dystonic reactions. She also reported that she had given Plaintiff his medications in one-week intervals instead of daily as directed by Dr. Brogdon. Dr. Brogdon noted that he and Plaintiff's mother would attempt to find a suitable person to manage Plaintiff's medications.[88]

On March 29, 2013, Plaintiff saw Tina Wells, M.D., at Ketchikan Indian Community Tribal Health Clinic for a physical for admission into the KAR House for alcohol rehabilitation. He reported that he had not consumed alcohol for three days. Dr. Wells

---

[86] A.R. 697–702. The assessment is dated February 4, 2013, but the assessment was signed on February 25, 2013. A.R. 702.

[87] A.R. 847–49.

[88] A.R. 896–97.

observed that Plaintiff's "thoughts [were] clear as [was] his spe[e]ch and judgment today."[89]

On April 2, 2013, Plaintiff followed up with Dr. Brogdon. He reported "doing much better" and expected to enter residential rehabilitation. He also reported that he was not currently having psychotic symptoms. Plaintiff's mother accompanied him to the appointment and reported that Plaintiff had been sober and had been taking his medications as prescribed. Dr. Brogdon observed that Plaintiff's affect was "fuller range than previously seen" with unimpaired judgment; fair insight; linear and goal-directed thought processes; grossly intact cognition at baseline; and no perceptual disturbances. Dr. Brogdon assessed Plaintiff with mood disorder, not otherwise specified; chronic paranoid schizophrenia; and chronic alcohol dependence with problems with coping skills and low functioning.[90]

On May 3, 2013, Plaintiff followed up with BWS Green at Ketchikan Indian Community Behavioral Health Department. BWS Green noted that "[m]edications appear to help stabilize [Plaintiff's] psychiatric discord; however, despite his best efforts, [Plaintiff was] unable to control his use of alcohol." She also noted that Plaintiff lived alone and had "inappropriate social contacts that jeopardize[d] his recovery leading recovery goals to be assessed as unachievable outside of a 24-hour structure."[91]

---

[89] A.R. 842–46.

[90] A.R. 898–99.

[91] A.R. 695–96.

On May 16, 2013, Plaintiff saw Dr. Brogdon. He reported that he would be attending rehabilitation "the Friday after tomorrow" and was drinking irregularly. Dr. Brogdon observed that Plaintiff was cooperative and that his mother attended and helped Plaintiff "get through the session." Dr. Brogdon also observed that Plaintiff's mood was "all right" with a flat and guarded affect; low to fair insight; and currently unimpaired judgment. Dr. Brogdon continued to assess Plaintiff with continuous alcohol dependence; chronic paranoid schizophrenia; mood disorder, not otherwise specified; low functioning; and problems with coping skills.[92]

On June 17, 2013, Plaintiff followed up with Dr. Brogdon. He reported going to a rehabilitation facility in Juneau and that he "was there a total of 2 weeks before dropping out of the program." He reported that he "got drunk and was manic and it took him approximately 5 days to be able to get to the airport and get on a plane to come back to Ketchikan." Dr. Brogdon also noted that Plaintiff was "now reporting that he is well and is not suffering any major issues with respect to his perceived bipolar disorder" and that he had been sober since returning to Ketchikan. Dr. Brogdon observed that Plaintiff's speech was "somewhat hypoverbal and nonpressured." He observed a flat, "somewhat unreactive" affect and low to fair insight, but he noted an otherwise baseline mental status examination for Plaintiff. Dr. Brogdon "strongly advised" Plaintiff to "continue to seek

---

[92] A.R. 900–01.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 26 of 64

another rehab option" and opined that Plaintiff's "prognosis [was] poor without treatment." He continued to assess Plaintiff with problems with coping skills and low functioning.[93]

On July 30, 2013, Plaintiff saw Dr. Brogdon. Dr. Brogdon noted that Plaintiff's mother attended the session and reported that while she had been "down south for a period of 2 weeks," Plaintiff "was off his medications and actually improved considerably." But Plaintiff reported that he had "started having more auditory hallucinations and also stopped sleeping, getting only about 2 hours a night." Dr. Brogdon observed that Plaintiff's mental status examination was at baseline for Plaintiff with low to fair insight. He noted that he would "continue current medications if [Plaintiff agreed] to let his mother dispense them to him, otherwise, we will have to terminate the patient from this clinic, as it is very unlikely that he will take medications as directed."[94]

On August 19, 2013, Plaintiff presented to the emergency room for a medication overdose. He reported running out of Seroquel and Ativan "a number of days ago and decided to compensate for his lack of medications with extra Trileptal of which he had excess." The attending physician noted that Plaintiff had "a very poor understanding of the reason he takes his medications" and on physical examination, Plaintiff was alert and oriented, but seemed "quite agitated with increased body movements" and occasionally turning his head "as if he is listening to someone, but he answers me quickly when I ask

---

[93] A.R. 902–03.

[94] A.R. 904–05.

him a question." Plaintiff denied suicidal ideation and homicidal ideation. He was discharged on August 20, 2013.[95]

On August 29, 2013, Plaintiff presented to the emergency department for a drug overdose. He denied hallucinations and denied suicidal thoughts. On physical examination, Plaintiff was obtunded with "poor eye contact and slurred speech" and a flat affect. He was discharged the same day.[96]

On September 4, 2013, Plaintiff followed up with Dr. Brogdon. Plaintiff's mother attended and reported that Plaintiff took his medications for the first time in several days the night before the session. She "admit[ted] she bought him Vodka [that] morning because [Plaintiff] claimed to be hallucinating." Dr. Brogdon observed that Plaintiff was disheveled and intoxicated with slurred speech and an expansive affect. Dr. Brogdon opined that Plaintiff "quite possibly [was] using his hallucinations as a way to manipulate his mother." He also opined that "[i[t still [was] very unclear what the true nature of the patient's psychopathology [was], given his frequent intoxication. At this point I would have to list it as a substance induced mood/psychotic disorder." Dr. Brogdon noted that he "[w]ould consider removing [Seroquel] completely except that the patient still seems to be benefitting from it."[97]

---

[95] A.R. 2532–2546.

[96] A.R. 2868–73.

[97] A.R. 906.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 28 of 64

On October 1, 2013, Plaintiff saw Joselita Chua, M.D., for an evaluation of depression, anxiety, and hallucinations. Dr. Chua noted that Plaintiff had been "previously seen by Dr. Brogdon." Plaintiff's mother attended the appointment and reported that Plaintiff "appeared to be at baseline as long as he [took] Seroquel, but [he] had run out of it after a trip last month, and his supply at home was stolen." She also reported that Plaintiff's "alcohol intake increases when he is off medication." Dr. Chua observed that Plaintiff was disheveled; restless; fairly spontaneous; fairly intrusive but directable; had poor eye contact; and refused to have his weight checked. She also observed that Plaintiff "appear[ed] to be internally stimulated, talking to self." Dr. Chua noted that she was "[u]nable to elicit clear delusional thinking due to degree of disorganization."[98]

On November 8, 2013, Plaintiff went to the emergency department of Ketchikan General Hospital by private vehicle for a potential seizure. He reported drinking less than 12 hours prior and was reported as "[u]nder the influence in the ED." He was discharged to the care of his mother on the same day.[99]

On November 29, 2013, Plaintiff saw James Knoll, M.D., for medication refills. He reported that he had "heard auditory hallucinations in the past, sometimes music, sometimes conversations" and that the hallucinations had been "critical in the distant past, but his Seroquel seem[ed] to be helping this." He also reported last using alcohol one month prior. On mental status examination, Dr. Knoll observed that Plaintiff was "not

---

[98] A.R. 907.

[99] A.R. 2853–60.

particularly well dressed, nor clean" and that there was a "hyper aspect about his movements." He observed that Plaintiff's speech was "spontaneous and goal directed and a little pressured." Dr. Knoll noted that Plaintiff's affect was "slightly hypomanic," but that Plaintiff had denied delusions, hallucinations, suicidal, homicidal, or assaultive ideations. Dr. Knoll observed that Plaintiff's judgment and insight were fair. Dr. Knoll assessed Plaintiff with bipolar disorder with depression and some hypomania and alcoholism. Dr. Knoll continued Plaintiff's Ativan, Seroquel, and Chantix prescriptions.[100]

On December 27, 2013, Plaintiff saw Maureen Stephenson, D.O., for medication refills. He reported not sleeping for days at a time. He reported rearranging his medication schedule to accommodate drinking. On mental status examination, Dr. Stephenson observed that Plaintiff's facial expressions and comments were "bizarre"; his speech was pressured, rapid in rate and rhythm with flight of looseness of associations; his thoughts were tangential and circumstantial with a mildly hostile affect; and he was unable to sustain focus. She noted that Plaintiff "endorse[d] active hallucinations and [was] very paranoid regarding providers and their agendas." Plaintiff claimed his hallucinations were "his best and most loyal friends." Dr. Stephenson refilled Plaintiff's Seroquel and Ativan prescriptions.[101]

On January 21, 2014, Plaintiff followed up with Dr. Knoll. He reported drinking the night before the appointment to "stop the voices, but that it did not help." On mental status

---

[100] A.R. 908–09.

[101] A.R. 910–12.

examination, Dr. Knoll observed that Plaintiff was "not particularly clean or neat" and that he "slouche[d] on the couch and close[d] his eyes most of the time." Dr. Knoll diagnosed Plaintiff with alcohol abuse, schizoaffective disorder, and personality disorder.[102]

On February 4, 2014, Plaintiff went to the emergency department at Alaska Native Medical Center in Anchorage, Alaska. He reported running out of Seroquel and requested a week's worth of medication. The attending medical provider noted that Plaintiff was "behaving appropriately."[103]

On March 14, 2014, Plaintiff saw Luciano Lizzi, M.D., for a reevaluation of his diagnoses, evaluation of symptoms, and a reevaluation of medications. Plaintiff reported that he often saw and heard people that were not there and that only occasionally knew that the individuals were hallucinations. He reported that he had not been drinking for "at least over 30 days." On examination, Dr. Lizzi observed that Plaintiff was casually dressed, was mildly sleepy, and was holding and eating a bowl of cereal. Dr. Lizzi also observed "an evasive and sarcastic attitude, mildly hostile and confrontational" with intermittent eye contact; hesitant, well-articulated, spontaneous speech with no stuttering and slurring of words; limited insight; fair judgment; normal memory; and distracted but intentional attention. Dr. Lizzi diagnosed Plaintiff with schizoaffective disorder, bipolar

---

[102] A.R. 913–14.

[103] A.R. 753–55.

type, sub-chronic; alcohol abuse, in remission for greater than 30 days; and narcissistic personality disorder.[104]

On May 7, 2014, Plaintiff saw Dr. Stephenson. Dr. Stephenson noted that Plaintiff was intoxicated at the appointment and was eventually escorted out of the office for continued inappropriate remarks. Dr. Stephenson recommended that Plaintiff's mother attend all future appointments with Plaintiff.[105]

On May 23, 2014, Plaintiff followed up with Dr. Lizzi. He reported feeling anxious. He also reported that a decreased dose of Seroquel causes him to "begin hallucinating and become[ ] agitated." On examination, Dr. Lizzi observed that Plaintiff was "shabbily dressed and bearded"; appeared distracted and anxious with fair insight; but otherwise displayed normal speech, thought processes, and thought content.[106]

On June 25, 2014 and July 25, 2014, Plaintiff followed up with Dr. Lizzi. He reported recent hallucinations. Dr. Lizzi opined that Plaintiff was "at risk for developing psychosis" and continued Plaintiff's prescriptions of Seroquel and Klonopin. He noted that Plaintiff would be monitored for alcohol use.[107]

On July 31, 2014, Wendel Winn, M.D., an agency consultant, reviewed Plaintiff's medical records and determined that Plaintiff's activities of daily living were markedly restricted; he had marked difficulties in maintaining concentration, persistence or pace;

---

[104] A.R. 915–19.

[105] A.R. 920.

[106] A.R. 921–23.

[107] A.R. 933–39.

and had moderate difficulties maintaining social functioning with the substance use disorder. Without the substance use disorder, Dr. Winn opined that Plaintiff's activities of daily living were mildly restricted and his social functioning and concentration, persistence or pace were moderately restricted.[108]

On August 25, 2014, Plaintiff followed up with Dr. Lizzi. He reported that he had not been able to sleep and that he occasionally experienced visual hallucinations. Dr. Lizzi observed that Plaintiff was casually dressed and neatly groomed with interactive, cooperative behavior; an anxious, but full range affect; and normal speech and thought processes.[109] Plaintiff continued to follow up with Dr. Lizzi on September 26, 2014, November 7, 2014, and December 8, 2014. He reported abstinence from alcohol since October 13 and hospital treatment for an ulcer.[110]

On January 20, 2015, Plaintiff presented to the emergency department with "multiple vague complaints." His mother reported that Plaintiff had been "acting delirious." The attending physician noted that Plaintiff was "very tangential and difficult to get a history from." Specifically, the physician noted that Plaintiff started "talking about aliens." Plaintiff reported being sober.[111]

On February 25, 2015, Plaintiff followed up with Dr. Lizzi. He reported that he had been diagnosed with "stomach cancer." Dr. Lizzi observed that Plaintiff was mildly

---

[108] A.R. 270–73.

[109] A.R. 940–42.

[110] A.R. 943–52.

[111] A.R. 1061–64.

anxious, withdrawn, and depressed, but displayed normal speech, judgment, and thought content.[112]

On March 17, 2015, Plaintiff was taken to the emergency department of Alaska Native Medical Center for medication overdose and acute alcohol intoxication. The attending physician noted that it was "unclear whether this may have been a suicide attempt versus over-medication with non-intentional overdose."[113]

On April 3, 2015, Plaintiff presented to the emergency department of Alaska Native Medical Center for another medication overdose. He was discharged on April 4, 2015.[114]

On May 25, 2015, Plaintiff was taken to the emergency department at Alaska Native Medical Center for auditory and visual hallucinations and bizarre facial expressions. He was observed to have flight of ideas and psychomotor agitation. Plaintiff tested positive for cannabinoids, but he was otherwise negative for intoxicants. The attending physician administered the antipsychotic Haldol, but after an hour, there was "no change in [Plaintiff's] behavior."[115] On May 26, 2015, Plaintiff continued to be hospitalized for acute psychosis with an "unclear etiology." On the same day, behavioral services provider Christopher Miller, LCSW, at SouthCentral Foundation, opined that Plaintiff continued to have an altered mental status and met the criteria for "gravely disabled e.g. vacuous sensorium orientation resulting in severe inability to meet basic

---

[112] A.R. 953–56.

[113] A.R. 1008–16.

[114] A.R. 2046–55.

[115] A.R. 2201–05.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 34 of 64

survival needs." LCSW Miller recommended API hospitalization for psychiatric stabilization.[116] Plaintiff was admitted and released from API on May 27, 2015.[117]

On June 2, 2015, Plaintiff followed up with Aravind Sanjeevaiah, M.D., at Alaska Native Medical Center after his hospitalization for acute psychosis. Dr. Sanjeevaiah noted that Plaintiff was currently being treated for T3NOMO signet ring carcinoma of the stomach, that Plaintiff had had "psychiatric challenges throughout the course of his chemoradiation therapy", and he had experienced acute psychosis post chemoradiation therapy. Dr. Sanjeevaiah observed that Plaintiff appeared "more coherent and less tangential than what he was a week ago. He, however, [was] still not completely in touch with reality as he many times [made] sentences, which [had] no meaning."[118]

On August 15, 2015, Plaintiff presented to the emergency department at Bartlett Regional Hospital after "seeming to be confused and altered on a commercial plane." The attending physician noted that Plaintiff was confused, had difficulty walking, and could not provide a history. EMS personnel reported finding an empty bottle of Seroquel, with a count of 20 tablets, which had been filled 2 days prior. A CT scan taken "did not demonstrate any acute intracranial abnormality." He was discharged the same day.[119]

On October 27, 2015, Plaintiff presented to the emergency department at Ketchikan General Hospital with tactile hallucinations, visual hallucinations, and

---

[116] A.R. 2190–92.

[117] A.R. 3044–49.

[118] A.R. 2176–79.

[119] A.R. 2056–65.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 35 of 64

responding to internal stimuli. The discharging physician reported that Plaintiff was sedated for 48 hours. He noted that the "Title 47 hold was released as it was no longer believed that his condition was primarily psychiatric in nature but rather related to his recent heavy alcohol intake." The physician also noted that Plaintiff had "a sudden unexpected outburst that prompted a code gray to be called, but this was easily handled with Seroquel and a dose of Zyprexa." Plaintiff was discharged on October 31, 2015 and was reportedly "remarkably stable."[120]

On November 11, 2015, Plaintiff saw Brian Trimble, M.D., at Alaska Native Medical Center for follow up after a "generalized tonic-clonic seizure" while in the emergency room on October 27, 2015. Dr. Trimble noted that Plaintiff's CT scan of the head was "essentially normal." He opined that Plaintiff's seizure was related to alcohol withdrawal.[121]

On November 12, 2015, Plaintiff went to the emergency department at Bartlett Regional Hospital for having a seizure on an Alaska Airlines flight. The attending physician opined that the seizure was "likely due to alcohol withdrawal syndrome" and noted that Plaintiff also appeared to be actively hallucinating. Plaintiff was discharged on November 19, 2015.[122]

---

[120] A.R. 2761–65.

[121] A.R. 2339–43.

[122] A.R. 3069–73.

On November 30, 2015, January 8, 2016, and January 11, 2016, Plaintiff was hospitalized for acute confusion and seizures believed to be related to alcohol withdrawal.[123]

On February 6, 2016, Plaintiff presented to the emergency department at Alaska Native Medical Center with alcohol withdrawal and Ernie Turner Center clearance.[124] He was discharged from Ernie Turner Center on April 6, 2016 due to his "medical needs."[125]

On April 25, 2016, Plaintiff saw Mark Mitchell, M.D., at Ketchikan Indian Community Tribal Health Clinic. He reported having insomnia and difficulty concentrating. Dr. Mitchell observed "[f]ast speech, difficulty staying on one subject." He prescribed Ritalin.[126]

On May 4, 2016, Plaintiff saw Susan Swift, PMHNP, for "continued treatment of anxiety disorder, bipolar disorder, obsessive compulsive disorder, panic attacks, post traumatic stress disorder, anxiety, schizoaffective disorder and depression." Plaintiff reported decreasing his Seroquel. He reported symptoms of depression over the last four months. He also indicated that he had symptoms of anxiety including, "feeling nervous and on edge, not able to stop worrying, worrying too much about different things, trouble relaxing, feeling restless, being easily annoyed or irritated and fear that something awful is going to happen." He reported that his anxiety made it very difficult to function "and

---

[123] A.R. 2766, 2786–92, 2796–2804.

[124] A.R. 2971–74, 2875.

[125] A.R. 2878.

[126] A.R. 3165–67.

take care of things at home and get along with other people." Plaintiff reported having panic attacks multiple times a day, lasting 30–60 minutes, and he avoided doing certain things and going places because of his fear of a panic attack. NP Smith reported an increased depression score, indicating moderate depression, and an anxiety score which indicated a high level of anxiety. On mental status examination, NP Smith observed that Plaintiff was neatly dressed and in no acute distress and was cooperative; friendly with a respectful manner; and had good eye contact. She observed that his thought processes were logical; relevant; coherent; and goal-directed with no evidence of flight of ideas; looseness of associations; thought blocking; psychomotor retardation; pressured speech; racing thoughts; circumstantiality; or tangentiality. She noted there was no evidence of delusional ideation; interference from or responses to internal stimuli; hallucinations; ideas of reference; mood swings; or compulsions. NP Smith observed that Plaintiff was alert and oriented in all four spheres with intact memory; attention; and concentration. She reported observing good judgment/insight.[127]

On May 20, 2016, Plaintiff saw Dr. Mitchell for alcoholism. Dr. Mitchell noted that "[i]nterestingly enough, in his intoxicated state, he stays on task better than he has off of it." Dr. Mitchell observed slurred speech, but he noted that Plaintiff was "earnest and more pleasant than usual."[128]

---

[127] A.R. 2981–85.

[128] A.R. 3168–70.

On June 3, 2016, Plaintiff followed up with Dr. Mitchell. He reported drinking again. He also reported that Ritalin was helping. Dr. Mitchell observed that Plaintiff's speech was logical and goal directed, but Plaintiff was easily distracted. He observed normal memory and judgment.[129]

On June 13, 2016, Plaintiff followed up with NP Smith. He reported that he wanted to get off his medications, but he couldn't sleep without them and experienced "[paranoia] thinking people [were] trying to kill him if he [stopped] his medication." He reported some symptoms of depression. Plaintiff also reported "periods of intense anxiety or panic that are unexpected and happen multiple times a day," lasting 1-2 hours. NP Smith observed some evidence of anxiety and otherwise a normal mental status exam.[130]

On July 26, 2016, Plaintiff followed up with Dr. Mitchell. He reported continuing to drink, continuing to have binges, and continuing to have seizures from withdrawal.[131]

On August 8, 2016, Plaintiff saw Catherine Foster Mitchell, DNP. Plaintiff reported running out of Seroquel three weeks prior to the appointment. DNP Mitchell noted that Plaintiff was "somewhat manic today" and unable to give much of a history. She observed rapid speech, grandiosity, and hyper-religiosity, perhaps. She noted that Plaintiff's mood was "variable, ranging from being quite humorous and somewhat giddy, to paranoid,

---

[129] A.R. 3171–73.

[130] A.R. 2992–95.

[131] A.R. 3182–84.

needing to end the session abruptly because there was something evil that had come into the room."[132]

On August 29, 2016, Plaintiff followed up with Dr. Mitchell. Dr. Mitchell observed that Plaintiff was intoxicated at the appointment.[133]

On September 6, 2016, Plaintiff followed up with DNP Mitchell. He reported that he had been sober for four days since returning home from Anchorage. He also reported that his mother was doling out each dose of his medications. DNP Mitchell noted that Plaintiff was sober and that there was marked difference in Plaintiff's mood, rate of speech, and content. She observed that Plaintiff was calm, not agitated, and "certainly apsychotic."[134]

On September 13, 2016, Michele Susie, FNP-C, from KIC Tribal Health Clinic, wrote a letter on Plaintiff's behalf. She stated that Plaintiff "has ongoing issues with bipolar and schizoaffective disorders that limit his ability to concentrate." She also stated that Plaintiff would "need some financial assistance to help with his living expenses."[135]

On November 4, 2016, Plaintiff saw Dr. Mitchell. He reported being sober for two months. He requested medication refills and reported that he was only taking Klonipin,

---

[132] A.R. 3204–05.

[133] A.R. 3189.

[134] A.R. 3206–07.

[135] A.R. 3042.

Seroquel, and Methylphenidate. Dr. Mitchell observed a normal mood and affect, memory, and judgment.[136]

On November 9, 2016, Plaintiff saw DNP Mitchell. He reported doing well with his medication regime for bipolar and ADHD. He also reported taking Antabuse and that he had been sober for two months "with a little over a week of that out of rehab."[137]

On December 15, 2016, Plaintiff followed up with Dr. Mitchell. Dr. Mitchell observed that Plaintiff spoke "with some pressure," but his speech was logical and goal directed. Dr. Mitchell also noted that some of what Plaintiff was saying was "somewhat grandiose."[138]

On January 19, 2017, Plaintiff followed up with DNP Mitchell. He reported recent audio and visual hallucinations and that he had been taking Quetiapine, Clonazepam, and OMIII FA's. He also reported that his hallucinations would "happen periodically, regardless of med compliance."[139]

On February 3, 2017, Plaintiff followed up with Dr. Mitchell. He admitted "to having visual and auditory hallucinations two days ago." He also stated that "when he drinks alcohol, he does not have the hallucinations." Dr. Mitchell observed that Plaintiff smelled of alcohol and admitted drinking the night before, although he was negative for alcohol at the time of the visit. He also observed that Plaintiff was very subdued and that "[t]his does

---

[136] A.R. 3196–98.

[137] A.R. 3208.

[138] A.R. 3199–3200.

[139] A.R. 3209.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 41 of 64

not, from a personality standard, even resemble the patient I have seen numerous times before."[140]

On April 28, 2017, Dr. Mitchell provided a letter on Plaintiff's behalf. Dr. Mitchell opined that Plaintiff was "not fit to work at the current time. He has Bipolar Disorder, resulting in haphazard, self-endangering behavior, visual and auditory hallucinations, paranoia and delusions, alternating with deep depression and psychomotor retardation. He takes the meds prescribed, and in addition, tries to treat himself with alcohol, because it makes the hallucinations go away. He has alternating periods of sobriety and intoxication, but even without the alcohol, he does not currently have the capacity to work at a steady, meaningful job."[141]

On July 18, 2017, Plaintiff presented to the emergency department "from an alcohol rehab facility secondary to developing altered mental status approximately 5-6 days into his detox stay." He had been residing at KAR house. Plaintiff's mother reported that Plaintiff had been taking all of his medications. On physical examination, the attending physician, Heather Dodds, M.D., observed loosening of association, flight of ideas, potential visual hallucinations, and a brief episode of shaking and agitation, but no loss of consciousness or evidence of a partial generalized seizure. She noted that Plaintiff believed that the year was 1917 and "Spencer" was President. Dr. Dodds opined that Plaintiff's "[s]igns and symptoms are most consistent with acute psychosis secondary to

---

[140] A.R. 3201–03.

[141] A.R. 3276.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 42 of 64

underlying bipolar/schizoaffective" and that "[a]lcohol withdrawal being 9 days out from last drink is unlikely."  She also stated, "[i]n addition as this alcohol facility was distributing his home medications it is unlikely to be related to an overdose leading to serotonin syndrome for example."  Plaintiff was diagnosed with decompensated schizophrenic affective disorder and was hospitalized on a Title 47 hold for grave disability in the setting of hallucinations and mania.  While hospitalized, the attending physician, Matthew Fitzpatrick, M.D., noted that Plaintiff remained "gravely disabled," although he did appear "somewhat improved over his arrival."  Plaintiff reported that the KAR house had stopped his clonazepam and Ritalin on admission "because they felt that they were drugs of abuse."  Dr. Fitzpatrick noted that Plaintiff's medications were restarted and Plaintiff "did not demonstrate any more hallucinations or psychosis during his stay."  Dr. Fitzpatrick opined that "[m]ost likely [Plaintiff] was using alcohol to help with his symptoms and now that it is no longer in his system and he is through the detox his significant affective disorder may be presenting itself."[142]

On June 10, 2018, Plaintiff saw Heather Russell, PsyD, for a neuropsychological assessment.  Ms. Russell observed that Plaintiff's memory abilities were "somewhat variable."  She also noted Plaintiff's executive functioning abilities were significantly impaired and Plaintiff was "quite limited in his ability to independently care for himself."

---

[142] A.R. 3328–3339.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 43 of 64

She opined that Plaintiff did not "have the capacity to maintain the pace and flow of a typical work day or to maintain independent work."[143]

*Function Reports*

On June 18, 2014, Plaintiff completed a function report. He reported that he lived alone in an apartment and had a pet, but that his mother bought food and litter and changed the litter box. Plaintiff reported that there were times when he could not sleep for a few days. He indicated that he could take care of his personal care and "sometimes" needed reminders to take his medications. Plaintiff reported that he could warm up "what my mom brings over" to eat; he didn't do chores; went outside every few days; walked and rode in cars for transportation because he did not have a car; could not pay bills or use a checkbook, but he could count change and handle a savings account. He reported, "[s]ometimes I talk to people who aren't there" and "I have command hallucinations and lucid dreams." He indicated that he could pay attention "if I'm interested" and could not finish what he started. He stated, "I feel better when I sleep. I avoid things[.] I always [k]new I was different. I am a human being, not a human doing. Everybody is valuable. I have special talents. I can see what people fear. I tell them the truth. They hate that. I can know a lot about a person in a few minutes. I scare people[.]"[144]

On June 19, 2014, Kathleen Y., Plaintiff's mother, completed a function report on Plaintiff's behalf. She reported that Plaintiff "has visual, auditory and olfactory

---

[143] A.R. 17–30.

[144] A.R. 588–96.

hallucinations which make it difficult for him to [distinguish the hallucinations from] reality. He also has bad insomnia [and erratic] sleep cycles, [especially] during manic episodes. His mood disorder makes sustaining casual relationships difficult. He is recovering from alcoholism, a torn ACL, and a torn [meniscus]." Plaintiff's mother reported that Plaintiff "had his own business at age 21 before his schizophrenia set in." She reported that Plaintiff "has bi-polar" and "[d]uring mania he doesn't sleep for 3 days. Then he sleeps a lot for a few days." Kathleen Y. reported that Plaintiff had a hard time concentrating and completing tasks; did not clean or do chores; and did not go out alone. She stated that Plaintiff "has psychotic breaks, but [he] is not violent. He does not remember them."[145]

*Testimony on September 8, 2016*

On September 8, 2016, Plaintiff appeared and testified with representation by his mother, Kathleen Y., before ALJ Paul Hebda. At the outset, the ALJ noted that for Title II purposes, Plaintiff's alleged onset date was May 4, 2012[146] and his date last insured was June 30, 2012. Plaintiff testified that he had psychotic breaks without drugs or alcohol and that he could not tell the difference between dreams and reality "pretty much" all of the time. He testified that anxiety could bring on a psychiatric break. He reported seeing and talking with people that didn't exist. Plaintiff testified that he lived alone and did chores when he could. He also testified that his mother went grocery shopping with him. He reported that he did not go to church; went to AA meetings, but didn't like them; and

---

[145] A.R. 597–605.

[146] The May 4, 2012 date was the date the Appeals Council denied review of the ALJ's decision regarding Plaintiff's previous claim. A.R. 261.

didn't go to bars due to social anxiety. He also reported that his "concentration's really been off too since my last chemotherapy I've noticed" and that he didn't "remember hardly anything of 2015."[147]

Jennifer Tippett, a clinical psychologist, testified as the mental health medical expert. Based on her review of the record, Dr. Tippett opined that Plaintiff's "mental health symptoms are secondary to his alcohol abuse." She specified that "[i]t does seem that [Plaintiff]'s heavy use of alcohol contributes to severe perceptual thinking disturbance, change in personality and emotional ability as [a] listing in 12.02." Dr. Tippett opined that she did not find enough evidence regarding concentration, persistence, and pace, but she did find evidence of poor social functioning based on alcohol use. She noted that there was "no evidence of what his mental state [was] sober." Dr. Tippett initially testified that Plaintiff had marked restriction of his activities of daily living and repeated episodes of decompensation under Listing 12.02. But, upon questioning by the ALJ, Dr. Tippett said she was "inclined to agree" with a mental health expert who had opined in 2010 that absent alcohol, Plaintiff would have mild limitations in his activities of daily living; moderate limitations with concentration, persistence and pace; and no issues of decompensation. At one point, Dr. Tippett testified that "absent alcohol, [Plaintiff] actually has a normal mental state." But, when the ALJ later asked the doctor, "[y]ou're not saying that there [are] no mental health issues, are you, absent alcoholism?" she responded, "I'm not, no." Upon questioning by Plaintiff's mother regarding Plaintiff's history of

---

[147] A.R. 161–81.

psychosis, Dr. Tippett acknowledged that "there seem[ed] to be a history of psychosis prior to [January 22, 2016]."[148]  Dr. Tippett testified that the psychotic episodes noted throughout the record were "induced by alcohol."[149]

Daniel LaBrosse testified as the vocational expert.  Based on the ALJ's first hypothetical,[150] Mr. LaBrosse opined that Plaintiff would not be able to perform past work. He opined that there were other jobs that existed in the national and regional economies that Plaintiff could perform, including cannery worker and small parts assembler.  Based

//

//

//

//

//

---

[148] Kathleen Y. asked Dr. Tippett if she had reviewed medical records from API "in either May or June of 2015," but Ms. Y. was unable to locate the exhibit at the hearing.  A.R. 153–56; *see* A.R. 3044–49.

[149] A.R. 146–61.

[150] The ALJ's first hypothetical was as follows:

> I have an individual of the claimant's age, education, past work experience who would have no exertional limitations and work would be limited to that [which] would allow the performance of simple to complex tasks but not entailing any contact with the public . . . [The] person would be able to perform light level work as defined by the Social Security Administration with frequent climbing of ramps and stairs, kneeling and crouching.  No climbing of ladders, ropes or scaffolding. And the avoidance of moderate exposure to unprotected heights and hazardous machinery.  And work would be limited to performance on one to four step tasks. Again, with no interaction with the general public.  Here we're talking about there would be no front counter customer service type work.  A.R. 185–86.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 47 of 64

on the ALJ's second hypothetical,[151] Mr. LaBrosse testified that the cannery worker and small parts assembler jobs would be eliminated.[152]

### Testimony on May 1, 2017

On May 1, 2017, Plaintiff appeared with representation by his mother, Kathleen Y., before ALJ Paul Hebda. The hearing was a continuation of the hearing of September 8, 2016. The ALJ also continued the May 2017 hearing to allow Plaintiff to submit more evidence.[153]

### Testimony on August 24, 2017

On August 24, 2017, Plaintiff appeared and testified with representation by his mother before ALJ Paul Hebda. The August 2017 hearing was a continuation of the hearings on September 8, 2016 and May 1, 2017, also before ALJ Hebda. Plaintiff testified that "after cancer, getting back to what full health is, is something I haven't been able to do."[154]

Jack LeBeau, M.D., testified as the medical expert. He testified that Plaintiff had several medically determinable impairments including anemia; diabetes II; alcohol

---

[151] The ALJ's second hypothetical was as follows:

[I]f I'm still dealing with the same hypothetical individual with the prior residual functional capacity of the light level exertional limitations, let's say that the combination of medical conditions and mental impairments would result in the individual being unable to engage in sustained work activity for a full eight-hour workday on a regular and consistent basis. A.R. 187.

[152] A.R. 181–89.

[153] A.R. 130–38.

[154] A.R. 117–18.

dependency with "some delirium episodes which appear to be related, or were possibly related"; chronic pyloric channel ulcer; Wilms' tumor in the right kidney resulting in kidney removal; alleged traumatic brain injury; gallstones related to pancreatitis; cholecystectomy; benign lung nodule; and multiple psychiatric diagnoses. He opined that Plaintiff did not meet or equal a listing. Dr. LeBeau opined that Plaintiff could lift and carry 20 pounds frequently and 50 pounds occasionally; sit up to six hours, stand up to four hours, walk up to two hours in the course of an eight-hour day; climb stairs and ramps frequently; ladders and scaffolds occasionally; balance, kneel, crouch, and crawl frequently; and have occasional exposure to unprotected heights and frequent exposure to moving mechanical parts.[155]

Collette Valette, a clinical psychologist, testified as the mental health expert. Based on her review of the record, she testified that Plaintiff had medically determinable impairments including alcohol dependency, chronic, sustained remission in a controlled setting; alcohol abuse; alcohol intoxication; substance abuse; alcohol withdrawal; medication overdoses; schizoaffective disorder, bipolar type; and insomnia. She opined that Plaintiff's mental health impairments did not meet or equal any of the listings. Dr. Valette opined that Plaintiff had no limitations understanding, remembering, or applying information. She specified that at medical appointments, doctors "didn't describe [Plaintiff] as needing directions repeated or [Plaintiff] having difficulty with comprehension." She opined that Plaintiff had no limitations interacting with others,

---

[155] A.R. 91–107.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 49 of 64

stating that "doctors didn't note that [Plaintiff] had difficulty interacting with them or the staff." Dr. Valette opined that Plaintiff had no difficulties concentrating, persisting, or maintaining pace. She opined that "[w]hen he's sober," Plaintiff had no difficulties adapting or managing himself. She noted that "[s]leep seems to be an issue that triggers delusions and hallucinations, as well as not taking his medications, as well as alcohol intoxication or substance abuse." Dr. Valette noted that "when [Plaintiff]'s intoxicated he's clearly not functioning well at all; not being able to pay attention." She noted that he was not belligerent and that his mental status was considered altered when intoxicated.[156]

Plaintiff's mother, Kathleen Y., questioned Dr. Valette as Plaintiff's representative. She pointed out that Plaintiff went to the emergency room on July 18, 2017 for a "psychotic break" and noted that the break was determined not to be related to alcohol withdrawal. Specifically, she stated, "And, the medical records say on that date that the signs and symptoms are most consistent with acute psychosis secondary to underlying bipolar schizoaffective." Ms. Y. also pointed out that at the time of the break, the record noted alcohol withdrawal was unlikely as Plaintiff had been "nine days out from the last drink." However, Ms. Y. was unable to point to the exhibit number in the record.[157] She testified that she had received a CD, but she was unable to open it. Dr. Valette asked

---

[156] A.R. 109–16.

[157] Based on a review of the record, the Court notes that it is likely Ms. Y was referring to the medical record from July 18, 2017. A.R. 3328–39.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 50 of 64

Ms. Y. for her source, but the ALJ stated, "Ms. [Y.], you're going to have to give an exhibit number." Dr. Valette did not address the inquiry.[158]

Brittany Pope testified as the vocational expert. Based on the ALJ's first hypothetical,[159] Ms. Pope opined that Plaintiff would not be capable of past work. She also opined that jobs existed in the national and regional economy that Plaintiff could perform including laundry worker II, hospital cleaner, and fish cleaner. Based on the ALJ's second hypothetical,[160] Ms. Pope opined that "[i]f you're going to add on medical conditions on top of the routine schedule that can interfere with the on task percentage of the day, the increasing of that 10%, that person would not be able to maintain competitive employment in an eight-hour day job, because they would be off task too much, and an employer would not tolerate that."[161]

## IV. DISCUSSION

Plaintiff is represented by counsel. In his opening brief, Plaintiff alleges that the

---

[158] A.R. 115–17.

[159] The ALJ's first hypothetical was as follows:

> I have an individual of the Claimant's age, education, and past work history; would be able to perform medium level work as defined by the Social Security Administration and with the following limitations; we would have occasional climbing of ramps and stairs, kneeling, crouching and crawling; we would have occasional exposure to unprotected heights; and frequent exposure to moving and hazardous machinery. A.R. 122.

[160] The ALJ's second hypothetical was as follows:

> Let's say a combination of medical conditions would result in the individual being unable to engage in the sustained work activity for a full eight hour workday on a regular, continuing basis. A.R. 125.

[161] A.R. 120–29.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 51 of 64

ALJ's decision was the product of reversible error of law and was not supported by substantial evidence for the following reasons: 1) "DA&A or drug addiction and alcoholism does not derogate from the finding that he met Listing 12.15 for trauma-and stressor-related mental impairment"; 2) "it failed to weigh the medical source statements and opinions of treating psychiatrist Stephen Brogdon, M.D. as reflected in medical treatment records"; and 3) the ALJ should have disqualified Colette Valette as a psychological expert witness.[162] Plaintiff seeks remand for the immediate payment of benefits.[163] The Commissioner disputes Plaintiff's assertions.[164] The Court addresses each of Plaintiff's assertions in turn:

A. Drug Addiction or Alcoholism (DAA) Evaluation

Plaintiff contends that "[h]e is disabled categorically because he met his burden of proof of disability for trauma- or stressor-related mental disorders" under Listing 12.15.[165]

_____

[162] Docket 26 at 2.

[163] Docket 26 at 32–33.

[164] Docket 31 at 5–12.

[165] Listing 12.15 states:

> [Trauma- and stressor-related disorders] are characterized by experiencing or witnessing a traumatic or stressful event, or learning of a traumatic event occurring to a close family member or close friend, and the psychological aftermath of clinically significant effects on functioning. Symptoms and signs may include, but are not limited to, distressing memories, dreams, and flashbacks related to the trauma or stressor; avoidant behavior; diminished interest or participation in significant activities; persistent negative emotional states (for example, fear, anger) or persistent inability to experience positive emotions (for example, satisfaction, affection); anxiety; irritability; aggression; exaggerated startle response; difficulty concentrating; and sleep disturbance. 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Specifically, Plaintiff argues that "the agency decision fails to address how [Plaintiff]'s trauma- or stressor-related mental disorder would be impacted by abstinence from alcohol."[166] The Commissioner asserts that "[t]he ALJ reasonably determined that Plaintiff's impairments, without the effects of drug and alcohol abuse, were not severe enough to meet the Listings."[167]

A finding of "disabled" under the five-step inquiry does not automatically qualify a claimant for disability benefits.[168] An ALJ must first conduct the five-step inquiry without separating out the impact of alcoholism or drug addiction.[169] In this case, the ALJ determined that Plaintiff's impairments, including the substance use disorder, met a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.[170] Although Plaintiff focuses on the fact that the ALJ did not discuss Listing 12.15 in his drug and alcohol materiality analysis, the ALJ's decision only discussed meeting Listing 12.03[171] with the substance use

---

[166] Docket 26 at 25–26.

[167] Docket 31 at 5.

[168] 42 U.S.C. §§ 423(d)(2)(C).

[169] *Bustamante v. Massanari,* 262 F.3d 949, 954–55 (9th Cir. 2001).

[170] A.R. 61.

[171] Listing 12.03 states:

> [Schizophrenia spectrum and other psychotic disorders] are characterized by delusions, hallucinations, disorganized speech, or grossly disorganized or catatonic behavior, causing a clinically significant decline in functioning. Symptoms and signs may include, but are not limited to, inability to initiate and persist in goal-directed activities, social withdrawal, flat or inappropriate affect, poverty of thought and speech, loss of interest or pleasure, disturbances of mood, odd beliefs and mannerisms, and paranoia. 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 53 of 64

disorder.[172]  In this case, any error in failing to discuss Listing 12.15 specifically in the ALJ's drug and alcohol materiality analysis is harmless.[173]

If the ALJ determines that a claimant is disabled and there is "medical evidence of [claimant]'s drug addiction or alcoholism, [the SSA] must determine whether [claimant]'s addiction or alcoholism is a contributing factor material to the determination of disability."[174]  To make the determination, the ALJ evaluates which of a claimant's current physical and mental limitations would remain if the claimant stopped using drugs or alcohol and then determines whether any or all of the remaining limitations would be disabling.[175]  It is the claimant's burden to prove his substance abuse is not a material contributing factor.[176]  The Ninth Circuit has recognized the difficulty in evaluating disability cases with drug and alcohol disorders combined with mental disorders and has distinguished "between substance abuse contributing to the disability and *the disability remaining after the claimant stopped using drugs or alcohol*," noting that "[j]ust because

---

[172] Although the title of the ALJ's Section 4 states, "[t]he claimant's impairments, including the substance use disorder, meet sections 12.03 and 12.15 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d))," the body of Section 4 discusses only Listing 12.03.  It was likely a typographical error to include Listing 12.15 in the title of Section 4 as the record has little evidence of trauma- and stressor-related disorders as defined by Listing 12.15.  A.R. 61–62. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

[173] *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").

[174] 20 C.F.R. §§ 404.1535, 416.935.

[175] *Id.  See also* SSR 13-2p, *available at* 2013 WL 621536 (Feb. 20, 2013).  Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration.  *See* 20 C.F.R. 402.35(b)(1).

[176] *Parra v. Astrue,* 481 F.3d 742, 744–45 (9th Cir. 2007).

substance abuse contributes to a disability does not mean that when the substance abuse ends, the disability will too."[177]

Here, the ALJ determined that if Plaintiff stopped his substance use, he "would continue to have a severe impairment or combination of impairments," but that Plaintiff would no longer meet or medically equal any Listing and would have the RFC to perform medium work with no mental limitations.[178] The ALJ gave great weight to testifying medical expert Dr. Valette's opinion that Plaintiff had no more than mild mental limitations when Plaintiff was not abusing substances.[179]

In the Ninth Circuit, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."[180] Throughout his decision, the ALJ focused on a single treatment record from May 4, 2016 by NP Swift to determine that Plaintiff had not more than mild limitations in any of the four functional areas for evaluating mental disorders when he was not abusing alcohol.[181] At the same time, the record demonstrates that Plaintiff experienced hallucinations and other symptoms during periods

---

[177] *Sousa*, 143 F.3d at 1245 (emphasis in original).

[178] A.R. 62–64.

[179] A.R. 62, 109–117.

[180] *Garrison,* 759 F.3d at 1017).

[181] A.R. 62–63, 66, 2981–85.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 55 of 64

of reported alcohol abstinence.[182]  There is evidence that Plaintiff's medications relieved his psychiatric symptoms, but also that Plaintiff experienced break-through symptoms.[183] There are also records of hospitalizations for psychiatric issues after detoxification.[184]  His treating psychiatrists continued to prescribe and adjust Plaintiff's psychiatric medications despite continued alcohol and medication abuse.[185]

Further, the ALJ discounted Plaintiff's treating and examining physicians' medical opinions while assigning great weight to one non-examining medical expert's opinion.[186] When "a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."[187]  This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."[188]  Here, the ALJ gave little weight to treating physician Dr. Mitchell's opinion of April 28, 2017, that Plaintiff "had alternating periods of sobriety and intoxication, but even without the alcohol, he did not currently have the capacity to work

---

[182] A.R. 908–09, 915–19, 2176–79, 2190–92, 2518–20, 3044–49, 3328–3339.

[183] A.R. 860, 864–65, 871–74, 881, 884–85, 888–95, 907–11, 915–19, 933–39, 2176–79, 2524–27, 3209.

[184] A.R. 2186–92, 3328–3339.

[185] *e.g.,* A.R. 886, 888, 896.

[186] A.R. 69–71.

[187] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[188] *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

at a steady, meaningful job." In rejecting the opinion, the ALJ stated that the opinion was "not consistent with the overall record," but provided by example only NP Swift's observations from May 4, 2016.[189] This is not a specific and legitimate reason supported by substantial evidence for rejecting Dr. Mitchell's opinion.

The opinions of agency physician consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source.[190] "The weight afforded a non-examining physician's testimony depends 'on the degree to which [s]he provides supporting explanations for [her] opinions.'"[191] Greater weight may also be given to the opinion of a non-examining expert who testifies at a hearing because he is subject to cross examination.[192] In this case, the ALJ discounted the testimony of medical expert Jennifer Tippett, Psy.D., at the September 8, 2016 hearing, giving "little weight to her opinion of [Plaintiff's] limitations while not abusing substance, as the evidence is consistent with more minimal limitations." But again, the only record the ALJ cited as evidence of more minimal limitations was the NP Swift record from May 4, 2016.[193]

---

[189] A.R. 69, 3276.

[190] 20 C.F.R. §§ 404.1513a(b), 416.913a(b).

[191] *Garrison,* 759 F.3d at 1012.

[192] *Andrews v. Shalala*, 53 F.3d 1035, 1042 (citing *Torres v. Secretary of H.H.S.*, 870 F.2d 742, 744 (1st Cir. 1989)).

[193] A.R. 70, 150–52.

Additionally, an evaluation completed by Heather Russell, PsyD, after the ALJ's decision, supports Dr. Mitchell's medical opinion that Plaintiff could not work even absent alcohol abuse. Dr. Russell concluded that Plaintiff would "not have the capacity to maintain the pace and flow of a typical work day or to maintain independent work" based on her review of available records, an interview of Plaintiff and his mother, and a mental status examination.[194]

The ALJ is responsible for resolving conflicts in medical testimony and resolving ambiguity.[195] Where the evidence can reasonably support either affirming or reversing the decision, a court may not substitute its judgment for that of the ALJ.[196] However, as set forth above, substantial evidence does not support the ALJ's determination that Plaintiff's mental limitations were not disabling absent the substance use disorder. The ALJ's reliance on the May 4, 2016 record by NP Swift is simply inadequate to support a conclusion that Plaintiff could have worked during the relevant time period if he had stopped drinking.[197]

In sum, the record contains extensive evidence supporting the notion that the disabling effects of Plaintiff's mental impairments would have remained had he stopped

---

[194] A.R. 17–30.

[195] *Andrews,* 53 F.3d at 1039.

[196] *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992) ("The [ALJ] and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.")

[197] *Parra v. Astrue,* 481 F.3d 742, 746 (9th Cir. 2007) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citing *Flaten v. Sec'y of Health & Human Servs.,* 44 F.3d 1453, 1457 (9th Cir. 1995).

drinking. The ALJ's determination that Plaintiff's substance use disorder was a material contributing factor was not supported by substantial evidence. Therefore, Plaintiff meets or equals Listing § 12.05 "and is entitled to a conclusive presumption of disability."[198]

## B. Dr. Brogdon's Medical Opinions

Plaintiff contends that the ALJ "failed to weigh the medical source statements and opinions of treating psychiatrist Stephen Brogdon, M.D. as reflected in medical treatment records."[199] The Commissioner argues that the ALJ did not err by not discussing Dr. Brogdon's medical opinions as the record showed Dr. Brogdon "did not offer any medical opinion about Plaintiff's work-related limitations."[200]

The applicable SSA regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."[201]

In this case, Dr. Brogdon opined that although Plaintiff demonstrated repeatedly that he was incapable of managing his own medications, Plaintiff did "benefit a great deal from being on an antipsychotic."[202] He continued to see Plaintiff as a patient despite

---

[198] *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

[199] Docket 26 at 26.

[200] Docket 31 at 9.

[201] 20 C.F.R. § 404.1527(a)(1). This section applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.614.

[202] A.R. 884.

Plaintiff's continued medication non-compliance because he believed "that to refer this patient to another provider at this point would be to further marginalize the patient, and eventually lead to an even worse outcome."[203]  Dr. Brogdon repeatedly assessed Plaintiff with poor coping skills; problems with social functioning; low functioning; and employment and economic concerns.[204]  However, Dr. Brogdon never specifically provided an opinion of Plaintiff's mental impairments nor assessed Plaintiff's functional limitations in the absence of substance abuse.

The ALJ determined that Plaintiff's impairments met Listing 12.03 with the substance abuse disorder.[205]  Therefore, absent an opinion regarding Plaintiff's mental limitations without the substance use disorder, the ALJ was not required to discuss Dr. Brogdon's opinions.  To the extent the ALJ committed error by failing to discuss Dr. Brogdon's medical opinion, the error was harmless.[206]

C. Dr. Valette's Testimony

Plaintiff asserts that "[t]he [ALJ] committed reversible error of law by according great weight to Colette Valette, Ph.D., who should have been disqualified as Psychological Expert witness."[207]  In response, the Commissioner argues that Plaintiff did

---

[203] A.R. 886.

[204] A.R. 865, 872, 875, 878, 880, 883, 889, 898.

[205] A.R. 61.

[206] *See Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012) (a court "may not reverse an ALJ's decision on account of an error that is harmless."), *superseded on other grounds by* 20 C.F.R. § 404.1502(a)(8).

[207] Docket 26 at 29.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 60 of 64

not provide evidence to support his contentions that Dr. Valette was disqualified from testifying.[208]

Because this matter is remanded on other grounds, this Court will not address Plaintiff's argument that Dr. Valette should have been disqualified as an expert witness in this case.

D. Scope of Remand

Plaintiff requests remand for the payment of benefits.[209] The Commissioner responds that "the Court need not consider the issue of remedy because, for the reasons discussed, the ALJ's decision is supported by substantial evidence."[210]

The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[211] A court follows a three-step analysis to determine whether the case raises the "rare circumstances" that allow a court to exercise its discretion to remand for an award of benefits. "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"[212] "Second, [the court] must

---

[208] Docket 31 at 10–12.

[209] Docket 26 at 32.

[210] Docket 31 at 12.

[211] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

[212] *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Garrison,* 759 F.3d at 1020).

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 61 of 64

conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'"[213] "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[214] "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'"[215] But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"[216]

In this case, the Court has found that the ALJ did not provide legally sufficient reasons for determining that Plaintiff's substance use disorder was a contributing factor material to the determination of disability. His discounting of Dr. Mitchell's, Dr. Russell's, and testifying expert Dr. Tippett's medical opinions was not supported by substantial evidence. Further, absent the substance use disorder, the ALJ found that Plaintiff's psychiatric symptoms would not have any impact on Plaintiff's ability to work.[217] As such, the Court has found that Step 3 has been established.

---

[213] *Id.* (quoting *Garrison,* 759 F.3d at 1020).

[214] *Treichler*, 775 F.3d at 1101.

[215] *Brown-Hunter,* 806 F.3d at 495 (quoting *Garrison,* 759 F.3d at 1021).

[216] *Id.* (quoting *Garrison*, 759 F.3d at 1021).

[217] A.R. 64.

Case No. 5:19-cv-00003-SLG
Decision and Order
Page 62 of 64

Second, the record has been extensively developed. It contains thousands of pages of treatment notes from medical visits from July 2007 through 2018, although there is only one record that remains for the remaining relevant time period from May 4, 2012 to June 30, 2012. The Court's record also includes testimony from Plaintiff about his symptoms and testimony from medical experts at two hearings. Third, if the disability opinions by Plaintiff's treating and examining psychiatric providers are credited as true, the ALJ would have been required to find Plaintiff disabled absent the substance use disorder. As stated above, Dr. Mitchell and Dr. Russell opined that Plaintiff was unable to work even absent his substance abuse. Thus, all three conditions to credit-as-true have been satisfied.[218] Having carefully reviewed the administrative record, including the extensive medical records, the Court concludes that remand for the payment of benefits is appropriate in this case, as "[n]o purpose would be served by remanding for further proceeding."[219]

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations were not free from legal error and were not supported by substantial

---

[218] *Leon v. Berryhill,* 880 F.3d 1041, 1044–45 (9th Cir. 2017), *as amended* January 25, 2018.

[219] *Lester v. Chater*, 81 F. 3d 821, 834 (9th Cir. 1996) (remanding for payment of benefits where evidence demonstrated that plaintiff met or equaled a listing). The Ninth Circuit has clarified that courts will "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison v. Colvin,* 759 F.3d 995, 1021 (9th Cir. 2014); *Burrell v. Colvin,* 775 F.3d 1133, 1141 (9th Cir. 2014).

evidence in the record. Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 26 GRANTED, the Commissioner's motion at Docket 31 is DENIED, and this matter is REMANDED for the payment of benefits.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 9th day of October, 2020 at Anchorage, Alaska.


*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE